THE PEOPLE OF PUERTO RICO, Plaintiff and Appellee, *v.*
ENRIQUE MUÑIZ MEDINA, Defendant and Appellant.

No. 15127.   Argued April 1, 1952.—Decided April 8, 1952.

*Víctor Rivera Colón* and *Santos P. Amadeo* for appellant. *Víctor Gutiérrez Franqui, Attorney General, (Federico Tilén, Acting Attorney General,* on the brief), *J. Rivera Barreras, Fiscal of the Supreme Court,* and *Frank Vizcarrondo Vivas, Assistant Fiscal,* for appellee.

PER CURIAM: The defendant was tried and convicted on the charges of assault to commit murder, carrying weapons and nonregistration of firearms. He has appealed to this Court from judgments sentencing him to one to 15 years, six months, and six months, respectively. On May 29, 1951 defendant filed a motion for bond pending appeal which we denied on May 31, 1951.

██ The first assignment is that "The Court erred in trying and convicting defendant-appellant because he had complete immunity pursuant to the provisions of Act No. 13, 1941 (Sess. Laws, p. 346)."

This error is predicated on the fact that the defendant made a statement under oath to the prosecuting attorney which was introduced in evidence at the trial. But we never reached the questions raised by the appellant as to the nature and scope of the provisions of Act No. 13 of 1941, Sess. Laws p. 346, relating to immunity of witnesses, and its application to him. The record shows that defendant never made a claim of immunity either when he made his original statement to the prosecuting attorney or at the trial in the lower court. Assuming, without deciding, that the defendant would be entitled to claim immunity under the circumstances of this case, *cf. People* v. *Quiñones,* 69 P.R.R. 682, we can find no basis for saying that he need not claim the said immunity at his trial. The defendant has cited no case and we have found none which holds that such a defense may be raised as here for the first time on appeal. The defendant having waived the alleged claim of immunity by not raising it at the trial, we find it unnecessary to examine the question here.

■ The second assignment is that "The verdict and the sentence are void because the information is fatally defective since it does not allege that defendant-appellant fired at policeman Aldahondo with the specific intention of killing him."

We see no merit in this contention, in view of the language of the information which reads in part that ". . . the referred defendant . . . unlawfully and voluntarily, with malice aforethought and deliberation *and with the firm and deliberate intent to cause his illegal death*, assaulted and battered with a pistol, which is a deadly weapon, Manuel Aldahondo Torres, a human being, firing at him then and there several shots, without succeeding in wounding him . . ." (Italics ours.)

■ The third assignment is that "The court committed error in instructing the jury on the elements of the offense of assault with intent to commit murder since it did not emphasize in its instruction that in order to commit said offense the manifest intention to kill is a necessary element."

Apart from the fact that the defendant did not object to any of the instructions of the lower court, we find no error in the instructions of the district judge which read in part as follows:

"The offense of assault with intent to commit murder is the same as an unsuccessful murder. It is the offense in which defendant has put in practice all the elements and all the resources necessary to commit murder, however, the offense was not committed for reasons beyond his control. Murder is the unlawful killing of a human being with malice aforethought. Murder is of two degrees, first and second. Any murder perpetrated by means of poison, lying in wait, torture, or any other kind of willful killing, perpetrated with deliberation and premeditation, or which is committed in the perpetration or attempt to perpetrate arson, rape, robbery, burglary or mayhem, is murder in the first degree, and all other kinds of murder are in the second degree. Malice is an essential element of murder. It conveys the meaning of the intentional wrongdo-

ing, the criminal purpose of doing a wrongful act toward another without the sufficient legal justification or excuse to do it. It is necessary that malice be afore-thought, prepense, that is, existing in the murderer's mind prior to the commission of the offense. But it is not necessary that he should have it in his mind for any appreciable length of time prior to the killing. It is sufficient if he has it in mind a minute before the commission of the offense for premeditation to exist. *Intention is an essential element of the offense of assault with intent to commit murder. To commit said offense it is essential that the assault be verified with the premeditated design to kill.* Malice aforethought and deliberation are characteristic elements of murder in the first degree. Deliberation is not required in murder in the second degree. In any of the two forms in which murder is intended, whether in the first or second degree, if the death of the assaulted person does not occur, it becomes assault with intent to commit murder." (Italics ours.)

The fourth and fifth assignments are as follows:

"*Fourth error:* The court erred in instructing the jury on policeman Aldahondo's authority to arrest defendant-appellant days after the alleged attempt against the life of said officer.

"*Fifth error:* The verdict of the jury is manifestly erroneous and contrary to evidence."

In connection with these errors, we quote the summary and argument of the Government's brief reading in part as follows:

". . . The evidence for the prosecution consisted in the testimony of policeman Manuel Aldahondo, Lieutenant of the Police Alejandro Oliveras and of Mr. Jenaro A. Jusino. The Government also introduced, and was admitted in evidence, an affidavit given by defendant several days after the alleged incident. The first witness for the prosecution and the only eyewitness presented by the People was policeman *Manuel Aldahondo Torres.* He testified that on October 31, 1951 he was on duty at Police Headquarters at Barrio Obrero, and that on that day at about five o'clock in the afternoon, Lieutenant Oliveras, his immediate chief, ordered him to stand together with Corporal Vélez and another policeman, by Vidal Santiago's barber shop at Barbosa Street where a skirmish was going on.

That when he arrived near the barber shop he dismounted and looked for a shelter from whence he answered the shots coming from the barber shop; that while engaged in sheltering himself and firing back he suddenly noticed that from among the crowd a person drew out a nickel-plated pistol, of the kind used in the army, and fired in his direction (R. 9). That the man fired from six to eight bullets which the magazine of the pistol (R. 9) holds, and that no other policeman or National guard was around him (the witness). Aldahondo also testified that as soon as the man fired the shots, he started running towards the North, towards the beach (R. 10) and as he pursued him, he saw that the man boarded a sort of an old truck which was standing at about 100 yards from the place where the shots were fired, which was driven by another person (R. 10 and 11), and that he and Corporal Vélez pursued the vehicle but they lost track of it. Finally, the witness testified that it was not until 10 or 15 days later, from a picture shown to him by Prosecuting Attorney Aponte at Police's General Headquarters (R. 12 and 26), that he was able to identify the person who had fired at him (R. 10).

"On cross-examination, policeman Aldahondo testified that he had seen defendant for the first time the day of the occurrence (R. 14), and that about 15 days later, when he went to render service in Henna School for the inscriptions, he found out that defendant lived in front of said school where he had a carpentry shop (R. 14). He also testified that when he returned to headquarters on that day he did not enter those facts in the Police blotter (R. 15). As to the way in which the incident occurred, the policeman testified that on that day there were about 200 persons gathered in front of Vidal Santiago's barber shop, and that the few policemen and National guards who were there were trying to enter the place from where the shots came (R. 16–17). That he could see the man who fired at him only from the chest up because he was mingled in the crowd and that he was of medium height, rather on the tall side, and a light brown. (R. 17). That he noticed that he wore no hat (R. 18) and he saw that the pistol with which he fired was nickel plated because it glittered in the sun (R. 18–19).

"Witness continued testifying that on that day he did not know the name of the person who shot at him and that when he learned 15 days later the place where defendant lived, he

could not arrest him because defendant had gone to Río Grande (R. 19). That he had known Agustín Muñiz, defendant's brother, for about two years, and that he remembered that on January 20, 1951, a Sunday which was the day following defendant's arrest, Agustín Muñiz came to his house with a copy of the newspaper 'El Imparcial' where the information of defendant's arrest had appeared (R. 20–21), and informed him that defendant was his brother, swearing by the Bible that he (the defendant) had not taken part in the occurrence (R. 22). That he was sorry to learn that defendant was his friend's brother and remained silent, because the latter had always been very nice to him, but in spite of it, he was a policeman and he was forced to accuse even his own brother. (R. 23). That he had no doubt whatsoever that defendant was the one who shot at him (R. 27) and that the very day of the occurrence he insisted with the Lieutenant that someone had fired at him, but that no report was made in the Police blotter (R. 23–24). The defense then asked the witness why, if he knew that Enrique Muñiz had fired at him, he had waited three months to testify, to which the witness answered that 'if you commit an offense and I do not arrest you now, I can not arrest you a half hour later' (R. 25). Because of that statement of the witness the defense requested the court to instruct the jury at that instance, as to the arrest that the police could make. The judge then instructed the jury as follows:

" 'Hon. Judge: Gentlemen of the Jury, a person, an insular policeman, a peace officer, who sees a person committing any offense whatsoever in his presence may proceed to arrest him. That is the rule as to the offenses; if time has elapsed, for example, if a person sees another committing any kind of offense today and time passes between that day and when he sees that person again, he has no authority to arrest him unless he has followed him from the moment he saw the offense committed until the time he sees the offender again. If the persecution is not interrupted, even if it is a month later, he may arrest him. This is not the question involved herein. Listen to what the policeman says and to the evidence of the defense. You are not to be concerned now with what the witness is testifying. He may say what he believes is the law.' (R. 25–26).

"After this instruction was given (which was in no way

objected by the defense), the witness continued testifying that he did not see defendant while he was on duty at Henna School, during the inscriptions, and that at headquarters they informed him that defendant's family was at Río Grande, but that he did not know appellant's whereabouts at that time. (R. 29).

"The second witness for the prosecution was Lieutenant *Alejandro Oliveras*. He testified that he was in charge of Barrio Obrero Headquarters on the day of the occurrence. Insofar as pertinent this witness testified that the report of the occurrence at Barrio Obrero on October 31 was entered in the Police blotter on November 6, 1950, and that it was signed by him (R. 35). That afterwards, as the investigation was carried on another report was made on January 19, 1951 in connection with the warrant of arrest against defendant for the offense of assault to commit murder against policeman Manuel Aldahondo (R. 36). And later, on February 3, 1951, a report from policeman Aldahondo was attached.

"As last witness for the prosecution, *Jenaro A. Jusino* testified that he was a contractor and that he had known defendant for about four or five years because he made the doors and windows for the buildings he constructed. That on November 1, 1950, at about eight or nine o'clock in the morning, defendant came to his house and asked him to serve as intermediary because he wanted to give himself up to the Police, that defendant told him that he wanted to give himself up because on the previous day he had been 'subversive' (R. 39). That he advised defendant that since the place of the occurrence belonged to Barrio Obrero, he should surrender to Barrio Obrero's Headquarters, to which he answered that he did not want to surrender at Barrio Obrero because since he was a Nationalist and the Police were nervous he feared something might happen to him (R. 40). That he then advised defendant to go to any section of Loíza Street, and that witness would speak with his brother Corporal Marchani, at police headquarters in Loíza Street, to see if he could get him to arrest defendant, which was done that same day in the morning (R. 41).

"On the cross-examination, witness testified that defendant was upset when he saw him. That defendant told him he feared something might happen to him because he was a Nationalist, but that defendant made no indication whatsoever of having

fired at any person, although witness testified that he did not ask him if he had committed any offense (R. 43).

"The district attorney then said that he was thinking of presenting *Corporal Marchani* as his last witness, stating that he would testify that defendant was arrested without a warrant, at his own request, and that he gave up voluntarily (R. 44). The defense accepted that the witness would testify on these particulars and a stipulation to this effect was approved.

"The district attorney then introduced in evidence defendant's affidavit given before District Attorneys José C. Aponte, Baldomero Freyre, and Ángel Viera Martínez, on the night of November 3 to 4, 1950, which affidavit appears from pp. 127 to 191 in the transcript of evidence. In said affidavit defendant stated that he held the position of Treasurer of the Municipal Board of Santurce of the Nationalist Party of Puerto Rico, of which barber Vidal Santiago was president (R. 135); that the Municipal Board of Santurce met weekly at Vidal Santiago's barber shop (R. 136); that the last meeting was held about two weeks prior to the occurrence of October 30 and that he had attended to about three meetings of the National Board of the Nationalist Party, of which Mr. Pedro Albizu Campos was president, Matos Paoli, secretary, and Raimundo Díaz Pacheco, treasurer (R. 134). Witness testified in detail on his activities as treasurer of the Municipal Board of the Nationalist Party in Santurce, as well as in connection with the different acts held by the Nationalist Party all throughout the Island, the last being held in Fajardo on October 26, 1950, to which he attended together with Vidal Santiago as part of the group escorting Albizu Campos (R. 145–147). In the course of the testimony, defendant was not specifically asked as to the occurrence which gave rise to the charge against him for assault to commit murder in the person of policeman Aldahondo. However, when he was asked if he had taken part in the skirmish at Vidal Santiago's barber shop, he absolutely denied having participated, (R. 177), and on the contrary alleged that when he heard that the skirmish started, he rapidly got away from Barrio Obrero, taking refuge in his brother's house so that nothing might happen to him (R. 163–173), and that on the following day, fearing the nervous tension of the police and the reprisals of the Nationalists

themselves, he asked his friend Jenaro Jusino to arrange with the police for his surrender (R. 159-161).

"That was the evidence for the prosecution which was heard by the jury who sat in this case. Analyzing this evidence and especially the testimony of the principal witness for the prosecution, policeman Aldahondo, appellant alleges that the testimony of this witness is so incredible and biased that, for lack of any corroboration, the same should not deserve credit from the members of the jury.

"Appellant first alleges that policeman Aldahondo admitted that he did not report at headquarters the incident of the shots fired at him by defendant, nor did he enter the same in the Police blotter, although the witness reported all the facts connected with the barber shop 'omitting everything that referred to the alleged shots fired at him by defendant' (p. 24; appellant's brief). Appellant's contention is not supported by the record. In the first place, there is no evidence that the report connected with the skirmish in front of Vidal Santiago's barber shop was written by policeman Aldahondo. Lieutenant Oliveras, Chief of Barrio Obrero's headquarters, testified that he did not remember who had written the report, but that he had signed it (R. 35), and that the report was made on November 6, 1950, *seven days after the occurrence,* because 'due to the situation we were going through on that day it was impossible to take these men from the service to have them sit and write a report' (R. 34). And even when it is true that policeman Aldahondo did not enter in the Police blotter the incident connected with appellant, however, it appears from the record that, on cross-examination the policeman testified that '*on that same afternoon*' (R. 24). '*I insisted with the Lieutenant that I had been fired some shots and I insisted on an investigation*' (R. 23). It is possible that, although he told the Lieutenant that someone had fired at him, policeman Aldahondo did not report it immediately in the police blotter, *since the witness did not know the person who had fired the shots* (R. 19), and it was 10 or 15 days later that he was able to identify defendant by a picture shown to him by District Attorney Aponte (R. 26).

"Neither is it true, as appellant alleges, that although policeman Aldahondo worked at Henna School, in front of defendant's house, during the inscriptions which took place a few days after the occurrence, he admitted that he did not arrest

defendant although he had seen him every day at his work shop and at his home (p. 25, appellant's brief). What policeman Aldahondo testified was that the day he went to work at Henna School he learned that defendant lived nearby 'because the detective was searching the house' (R. 25), but that does not mean that on that day he had the opportunity to identify defendant, and yet failed to arrest him. Policeman Aldahondo did not know appellant, and categorically testified *that on that day he did not see Enrique Muñiz Medina, and that he did not know his whereabouts* (R. 29). And it is impossible that he could have seen him, for according to the record, defendant gave up to the police on *November 1, 1950,* being a prisoner up to *November 10, 1950* (R. 73), taking judicial notice of the fact that the inscriptions were held in Puerto Rico during November 4 and 5 (see R. 182).

"As we have previously stated, policeman Aldahondo was able to identify his assaulter 10 or 15 days after the occurrence by a picture shown to him by District Attorney Aponte, and it was on the basis of this identification that the investigation which culminated in defendant's arrest on January 19, 1951 was brought about (R. 36). It is logic to think that it was precisely because the incident happened within the confusion existing in front of Vidal Santiago's barber shop that defendant's arrest was not made immediately after the policeman identified him when his picture was shown to him, and that it was not until the district attorneys were fully convinced of the identity of the person identified by Aldahondo that they proceeded to arrest defendant.

"Appellant contends that the Government could have introduced evidence to corroborate Aldahondo's testimony, and yet, it did not do so, but appellant forgets that defendant's affidavit given on the night of November 3, 1950, was admitted in evidence, and it appears therein that defendant was treasurer of the Municipal Board of the Nationalist Party in Santurce; that the president of the Board was Vidal Santiago; that defendant was on the day of the occurrence with Vidal Santiago in his barber shop until a few minutes before the skirmish began (R. 163) and that Vidal Santiago had a pistol and told him that he was going to defend himself, that he should do the same thing, and (R. 177) that he was going to die like Pedro Albizu Campos (R. 178).

"And if those circumstances were not sufficient corroboration to the facts stated by policeman Aldahondo, there are still other details which strengthen the testimony of the principal witness for the prosecution. Policeman Aldahondo testified that the man who fired the shots at him ran towards the beach and boarded 'a sort of old truck' which was about 100 yards from the scene of the incident and that it was in that vehicle, driven by another person, that he was able to escape (R. 10). And it is significant that defendant testified in his sworn statement before District Attorney Aponte that he had a 'small pick-up,' which was previously a car and which was converted into a truck (R. 164).

"The defense took pain in proving that the person who had fired the shots was a white, tall man in shirt sleeves, and that on the contrary, defendant that day, at that instant, wore a dark colored suit *with a coat*. However, when María Márquez, *witness for the defense* was asked on direct examination how defendant was dressed, she testified as follows:

" 'Q. Do you remember having seen your ex-brother-in-law at about four or half past four in the afternoon near your house?

" 'A. I saw him standing across my house.

" 'Q. What is there across your house?

" 'A. A radio shop.

" 'Q. Do you know who owns the radio shop?

" 'A. I saw him here too.

" 'Q. Did you see him standing when his brother arrived in a car? Which brother?

" 'A. Brother Benjamín.

" 'Q. The engineer?

" 'A. The engineer.

" 'Q. Did he board the car?

" 'A. He also got into the car.

" 'Q. Do you remember how your brother-in-law was dressed?

" 'A. *He was in shirt sleeves.*

" 'Q. Try to recall to see if you remember it?

" 'A. *Yes, he was in shirt sleeves.*

" 'Q. At that moment?

" 'A. *Yes, sir.'* (R. 120–121).

"Immediately after this witness testified, upon the defense stipulating that defendant was going to testify the facts appearing in the affidavit that the People had introduced in evidence, the defense was very careful to add to the stipulation that defendant would also testify 'that when he was coming along Buenaventura Street (where the previous witness saw him) he met his brother and stopped a few seconds in front of the radio shop, *that he had taken off his coat and was carrying it on his arm'* . . . (R. 125). However, defendant's brother had categorically testified that defendant was wearing a coat when he met him in front of the radio shop (see R. 94).

"The defense tried to prove that defendant did not participate in any way in the skirmish that took place at Barrio Obrero, and produced evidence to show that when the first shots were fired, defendant, who just then had left Vidal Santiago's barber shop, walked away rapidly from the scene of the incident, being almost immediately picked up by his brother Benjamín and taken in an automobile to his grandmother's house. . . ."

The fourth assignment, as we have seen, relates to the instruction given by the court at defendant's request relating to the authority of the policeman to arrest appellant. Assuming that this instruction was partly erroneous, the defendant made no objection and never requested a correction. He therefore can not raise it for the first time on appeal. In addition, we fail to see how this instruction could have been so prejudicial as to warrant reversal.

█ As to the fifth assignment, the defendant produced several witnesses in connection with his defense that he was not present at the scene of the incident and that he was not the man who shot at policeman Manuel Aldahondo Torres. The jury resolved this conflict in the evidence and we find no basis for interfering with its action in that respect.

The judgment of the District Court will be affirmed.